VICTOR E. VAN DUZER AND JANE N. VAN DUZER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Duzer v. Commissioner
Docket No. 25802-88
United States Tax Court
T.C. Memo 1991-249; 1991 Tax Ct. Memo LEXIS 292; 61 T.C.M. (CCH) 2791; T.C.M. (RIA) 91249; June 5, 1991, Filed *292 Decision will be entered under Rule 155. Jonathan Cobb Dickey and David S. Foster, for the petitioners. Steven J. Sibley, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661
1984
$ 232,941.00
$ 11,647.05
50 percent of
$ 58,235.25
the interest due
on $ 232,941.00
1985
350,555.00
13,481.00
50 percent of
[2] 67,405.00
the interest due
on $ 269,620.00
*293 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c) for each of the taxable years in issue. Following concessions, [3] *294 the issues for decision are: (1) Whether the purchase prices of two windfarms, purchased by Victor E. Van Duzer in 1984 and 1985, were in excess of their respective fair market values; (2) whether a portion of the purchase price of each windfarm purchased by Victor E. Van Duzer, in 1984 and 1985, should be allocated to warranties made by FloWind Corporation -- the seller and manufacturer of said windfarms; (3) whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661; and (4) whether petitioners are liable for the increased rate of interest under section 6621(c). [4]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Victor E. Van Duzer and Jane N. Van Duzer, husband and wife, resided in Los Altos Hills, California, when they filed their petition in this case. Petitioners filed joint Federal income tax returns for taxable years 1984 and 1985 with the Internal Revenue Service Center in Fresno, California. Mr. Van Duzer (petitioner) has a masters degree in electrical engineering from Stanford. He worked for Hewlett-Packard for nine *295 years in the development of new products and project management. Petitioner was the founder and president of a microwave component manufacturing company, and has been a member of the board of directors of several companies. Petitioner was retired in 1984. Since 1971, petitioner has had experience in analyzing investments. In the summer of 1984, he investigated investments in various types of alternative energy sources, including solar and wind energy. In the fall of 1984, petitioner visited several operating windfarms, which were all located in California. A windfarm consists of fully erected operating wind turbines which are connected to a utility or energy user and able to generate electricity. Petitioner decided to evaluate an investment into wind energy. He obtained private placement memorandums and offering circulars from various windfarm offerings, spoke with windfarm sponsors, and visited several windfarm sites. The windfarms that petitioner investigated were mostly being offered for sale through limited partnerships. Petitioner determined rates of return on various windfarm offerings and concluded that he would receive the best rate of return by purchasing a windfarm *296 from FloWind Corporation (FloWind). In determining the profitability of a windfarm, petitioner considered the tax benefits he expected to receive from purchasing a windfarm. Petitioner visited a FloWind windfarm, that was located on Cameron Ridge, which is located between the townships of Tehachapi and Mojave in Kern County, California. Cameron Ridge is in Tehachapi Pass which is in a low section in the Sierra Nevada-Tehachapi Mountains ridgeline. The windfarm consisted of 19-meter and 17-meter vertical axis wind turbine generators. The wind turbine generators are made of two aluminum extruded rotor blades designed in the shape of an airfoil which are vertically attached to a mast. The mast rests upon a base structure which houses a gear box and induction motor generator. As electricity is produced from the rotation of the mast, the electricity generated is transmitted to pad mounted transformers, which in turn transmit the electricity to substations. Electricity was transmitted from the substations to Southern California Edison Company's (Southern California Edison) transmission system, where it is distributed to its customers. FloWind was organized, in 1981, under the laws *297 of the State of Washington. Flowind's purpose was to develop and construct wind turbines to generate electricity. The wind turbines would be sold to individuals, corporations, and limited partnerships which in turn sell the electricity generated by the wind turbines to utilities. FloWind commenced business operation in March 1982. During the early 1980s, FloWind sold windfarms to limited partnerships. Either FloWind or its affiliates and subsidiaries acted as the general partners of the limited partnerships, and also performed management, operation, maintenance and repair, and other services for the limited partnerships. FloWind manufactured and installed wind turbines purchased by the limited partnerships. Some of the limited partnerships that acquired wind turbines from FloWind include, FloWind Partners I (issued in fall of 1983), FloWind Partners II (issued in spring of 1984), FloWind Partners III (issued in December 1984), FloWind Partners 1984 (issued in October 1984), and FloWind Partners IV. According to the FloWind Partners IV private placement memorandum, the first FloWind wind turbine was an initial test 17-meter wind turbine generator installed on May 20, 1982; *298 as of September 30, 1984, 86 17-meter wind turbine generators had been installed; as of December 31, 1984, 254 17-meter wind turbine generators had been installed; during 1984, an affiliate of FloWind had installed two test 19-meter wind turbine generators, and FloWind had added 34 19-meter wind turbine generators to 17-meter windfarms to bring the windfarms up to production levels required by warranties. In November 1984, petitioner entered into negotiations with FloWind for the purchase of a windfarm. Petitioner believed that he would save promotional fees, and would have more control over his windfarm by directly purchasing a windfarm from FloWind. As a result, petitioner did not purchase his windfarm as an investor in a limited partnership. Prior to purchasing his windfarm, petitioner received and reviewed copies of FloWind Partners II and FloWind Partners 1984 private placement memorandums. Petitioner also received and reviewed a Report on the Engineering Evaluation of the FloWind Partners 1984 Windpark (Stone & Webster report), which was prepared by Stone & Webster Engineering Corporation and was dated October 1984. The FloWind Partners 1984 windfarm consisted of 17-meter *299 wind turbine generators and was located on Cameron Ridge. [5] According to the Stone & Webster report, the objective of the evaluation was to assess all major aspects of the Flowind Partners 1984 windpark from engineering, construction, operation and maintenance perspectives. The Stone & Webster report also assessed the wind resource and the site suitability of the property, the equipment system performance, and the estimated project output. The Stone & Webster report stated that from a technical perspective, FloWind Partners 1984 can achieve its estimated performance, availability, and service life by careful implementation of the expertise, designs, specifications, and prior experience available to the project. The Stone and Webster report concluded that "Cameron Ridge, with an annual average wind speed of about 24 mph on the BLM property is an excellent site for a wind energy *300 project." Petitioner also received a wind study on the Cameron Ridge area, which was performed by Dr. Edwin X. Berry of Atmospheric Research & Technology, Inc. [6] Dr. Berry has a Ph.D. in Atmospheric Physics. The report was prepared for FloWind Partners III and was dated November 1982. The report was revised in July 1983 and was reissued in July 1984. Dr. Berry's study was based upon the wind speed measurements taken from 6 anemometer stations which were placed on Cameron Ridge. The anemometer stations were designated CAM1, CAM2, CAM3, CAM4, CAM5, and CAM6. The wind measurements were recorded from CAM1 beginning in June 1981, and from CAM2 through CAM6 in July 1981. [7] Generally, 12 months of wind speed data is needed in order to predict wind speeds with 90 percent accuracy. Due to vandalism, wind measurement data recorded from CAM2 through CAM6 was for less than one year. Dr. Berry grouped the data from the wind speed measurements into "low" and "high" values, and computed that the low group had an estimated mean wind speed of 20.3 miles per hour, and the high group had an estimated wind speed of 22.8 miles per hour. In addition, Dr. Berry concluded that: The wind evaluation *301 indicates that energy can be obtained from the wind for over 70 percent of all hours of the year and for all months of the year. * * * Cameron Ridge has stronger, more consistent wind power than any *302 other site currently proposed for wind-electric development in the United States. With economic returns on wind-electric power plants directly related to the quality of the wind-energy resource, Cameron Ridge represents the best known wind-electric power project site in the State of California. Based upon Dr. Berry's report and the Stone & Webster report, petitioner believed that the Cameron Ridge area had the best wind resource of all the other windfarm offerings he had investigated. Petitioner also received and reviewed a packet entitled FloWind Partners 1984 Due Diligence Documents. Contained in this packet were various documents compiled in connection with the FloWind Partners 1984 limited partnership offering. The documents contained in the packet included a Power Purchase Contract between FloWind and Southern California Edison, the Stone & Webster report, an insurance contract between FloWind and Zurich Insurance Company, various construction permits and lease agreements, and technical data on the FloWind 17-meter wind turbine generator. Petitioner also received and reviewed a report prepared by American Appraisal Associates for FloWind Partners III. The report stated: *303 Based upon our investigation and appraisal, it is our opinion that the stated purchase price of the Windfarm to the Partnership does not exceed the fair market value of the Windfarm. Petitioner also reviewed FloWind projections on the anticipated energy production of the windfarm. FloWind estimated that the "designed projected output" of petitioner's 19-meter windfarm would be 1,650,000 kilowatt hours per year, or 550,000 kilowatt hours per wind turbine generator per year. The designed projected output of a windfarm is based upon the "power curve" of the wind turbine generators used in the windfarm and the wind characteristics at the windfarm site. The power curve represents the expected power output, at different wind speeds, of a wind turbine generator located at sea level. The wind conditions of a windfarm site are applied to the power curve to arrive at the expected electrical output for a typical wind turbine generator at the windfarm site. Prior to December 1984, no actual production data was available regarding the performance of 19-meter wind turbine generators. 1984 Windfarm
Petitioner purchased his windfarm by entering into a "Windfarm Construction Agreement" *304 (1984 agreement) with FloWind, which was dated December 20, 1984. Pursuant to the 1984 agreement, FloWind constructed and sold to petitioner a windfarm (1984 windfarm) which consisted of three 19-meter wind turbine generators, cement pads, and electrical transmission lines which ran up to, but not including, the pad-mounted transformer. The windfarm was to be constructed on property leased by petitioner in the Tehachapi Mountains, Kern County, California. At the time of his purchase, petitioner was the first individual purchaser and owner of 19-meter wind turbine generators. He selected the 19-meter wind turbine generator because it had a higher projected output than the 17-meter wind turbine generator. The purchase price of the 1984 windfarm was $ 1,065,000 or $ 355,000 per wind turbine generator. Petitioner paid $ 690,000 cash and executed a level payment nonrecourse note in the amount of $ 375,000. The note was to be repaid in 20 annual installments of $ 41,674.40, at an interest rate of 9 percent per annum. Petitioner has made all required payments on the nonrecourse note. Detailed specifications of the 19-meter wind turbine generators were attached to the 1984 agreement. *305 In addition, the 1984 agreement included warranties similar to those FloWind had negotiated with investment bankers in connection with syndicated partnership offerings. FloWind did not sell windfarms without warranties. Through their stipulations, the parties have summarized the warranties that FloWind made in the 1984 agreement, as follows: c. Five Year Warranty against Defects, etc.FloWind warranted that, except for normal wear and tear, each wind turbine generator (WTG) would be free from defects in material, workmanship, or design or other malfunction or failure to perform for five years. In addition, FloWind warranted that the WTG's (including towers) would be capable of withstanding wind conditions up to 140 miles per hour without damage, that the turbines and towers would be compatible and not subject to damaging harmonic resonance; that all components not manufactured by FloWind were used within their specifications and for their intended purposes; and that all WTGs met or exceeded descriptions and specifications. The remedy for breach was for FloWind to remedy the defect, including, if necessary, repair or replacement at the 1984 Site, without charge and within *306 a reasonable time. d. Five year availability warranty. FloWind warranted that, in the absence of an occurrence not covered by the warranties, each WTG would be available for intended operation at least 90 percent of each year for five years. This 90 percent performance warranty was guaranteed for five years following the WTGs' commissioning and delivery to Mr. Van Duzer. If any WTG needs repair, alternation, (sic) replacement or turbine shut down is necessary, FloWind will reimburse Mr. Van Duzer as follows: (1) This warranty applies if the WTG is unavailable exceeding an aggregate of 877 hours (36-1/2 days), in any year within the five year period following commissioning. (2) For each hour of unavailability after 877 hours, FloWind will pay to Mr. Van Duzer an amount based on the affected WTG's projected kilowatt hours. This projection is equal to the Windfarm's applicable wind speeds multiplied by the projected power performance curve (as shown in Exhibit 3-C). (3) This amount is then multiplied by the contracted price of electricity. (4) This warranty can provide up to $ 25,000 per WTG per year. e. One year power performance warranty. FloWind warranted *307 that each WTG would be capable of operating at 90 percent of projected power performance, in accordance with a power production curve, for a period of one year. The remedy for breach was modification of the WTGs or the provision of additional WTGs, as follows: (1) After consulting with Mr. Van Duzer and an outside expert, wind speed measurements of another WTG similar to the warranted turbine will be made by FloWind. (2) This windspeed data will be collected at FloWind's expense at least once per month. (3) The windspeed data of the paired WTG will then be compared to 90 percent of the power performance of the warranted wind turbine. (4) If Mr. Van Duzer determines that at any time during this measurement period, the 90 percent power performance has not been consistently met, FloWind is required to either (i) fix all the WTGs, (ii) provide Mr. Van Duzer additional WTGs to produce an amount equal to 90 percent of the power performance of the total Windfarm, or (iii) or a combination of alternatives (i) and (ii). (5) This warranty also provides for subsequent one year data collection to insure the Windfarm is operating at the 90 percent power performance curve. f. *308 Five year output warranty. FloWind warranted that, in the absence of force majeure, the Windfarm would produce no less than 50 percent of its designed projected output of 1,650,000 kilowatt hours per year for each of the first five years of operation. The remedy for breach is payment of the additional revenues that would have been earned if 50 percent of the designed projected output had been produced, less any cash amounts paid under other warranties. Revenues will be determined by the average per kilowatt hour price for electricity sold to Southern California Edison during the calendar year at issue. This warranty precludes FloWind from obtaining a refund if electrical generation subsequently exceeds projections. Under this warranty, FloWind agreed to relocate 90 percent of the Windfarm's lowest producing WTGs if the individual WTG does not produce 50 percent of its individual projected output on a cumulative basis as of the end of any of the first five years (or make other arrangements). An Act of God will automatically set the WTG at the 50 percent level. g. Three year output warranty. FloWind agreed to add additional wind turbines or otherwise modify the Windfarm *309 on or before December 31, 1990, if, in the absence of force majeure, the Windfarm did not produce an average of at least 67 percent of designed projected output during the first three years. An Act of God brings FloWind into compliance under this warranty. 1985 and 1986 production data can be used to compute the 67 percent designed projection. h. Three year installation warranty. FloWind warranted for a period of three years that the Windfarm had been installed in a good and workmanlike manner on unfilled ground, that components which together comprise the Windfarm (excluding the WTGs) were free from defects in material, workmanship and design or other malfunction or failure to perform under normal use and service, and that FloWind had obtained all required building permits. The remedy for breach was to remedy the problem, including, if necessary, repair or replacement at the Windfarm, without charge and within a reasonable time. No portion of the purchase price of the 1984 windfarm was allocated to any of the warranties described above. The warranties referred to above are extended while the wind turbine generators or related components are not functioning properly. *310 FloWind specified in the 1984 agreement that the 19-meter wind turbine generators would produce 550,000 kilowatt hours per year and warranted that each wind turbine generator would produce 275,000 kilowatt hours per year. The warranties FloWind made in connection with the sale of its wind turbine generators were made in response to competitive pressures from other windfarm developers. Petitioner would not have purchased the 1984 windfarm from FloWind without the warranty agreement. Petitioner entered into various contracts in connection with his purchase of the 1984 windfarm. These contracts are: An Operation, Repair and Management Agreement; a Transmission Facility Agreement, which included an assignment of a Long Term Power Purchase Contract with Southern California Edison Company; an Authorized User Agreement; and a Windfarm Easement Agreement with Wind Energy Company, a subsidiary of FloWind. Prior to executing these contracts, petitioner hired a lawyer to review the contracts. These contracts are summarized below, and unless otherwise indicated, all of these contracts were dated December 20, 1984. Petitioner and FloWind entered into an Operation, Repair and Management *311 Agreement. The agreement provided for a monthly fee equal to 6 percent of gross revenues derived from the sale of electricity, plus an incentive fee equal to 15 percent of the amount by which gross revenues exceeded projections, during the years 1984 through 1994. This incentive fee was increased to 30 percent in 1995 and the years thereafter. The agreement had an initial 1-year term, and was automatically renewed for up to 29 additional 1-year terms. Petitioner and FloWind entered into a Transmission Facility Agreement. Pursuant to the agreement, FloWind granted to petitioner a non-exclusive right and non-exclusive license to use FloWind's transmission facilities for the purpose of transmitting electric power between the 1984 windfarm and Southern California Edison's transmission system. The transmission facilities were constructed by FloWind, and included substations, and related collector lines and interconnections. Under this agreement, FloWind assigned to petitioner its rights under a Power Purchase Contract with Southern California Edison. [8] Petitioner agreed to pay an annual interconnection service charge in the amount of $ 1,700 per 19-meter wind turbine generator. *312 Beginning on January 1, 1986, the service charge was subject to annual increases based upon the consumer price index. In September of 1983, the United States Department of the Interior, Bureau of Land Management, entered into a Right-of-Way Grant with Wind Energy Company for the construction, operation and maintenance *313 of wind turbine, electric generators, electric transmission lines, access roads and ancillary facilities. The basic rent payable under the Right-of-Way Grant was 4 percent of gross revenues (with certain minimums). In May of 1984, FloWind acquired 100 percent of the stock of Wind Energy Company. Petitioner, FloWind, and Wind Energy Company entered into an Authorized User Agreement dated December 19, 1984, whereby Wind Energy Company conveyed to petitioner the right to use the windfarm property for the 1984 windfarm, subject to the terms and conditions of the Right-of-Way Grant, through September 22, 2013, or upon sooner termination of a Windfarm Easement Agreement. Petitioner entered into a Windfarm Easement Agreement with Wind Energy Company. Pursuant to this agreement, Wind Energy Company granted to petitioner the right to use the property at the 1984 windfarm site and also granted a right of access over roads to the 1984 windfarm. Petitioner agreed to pay a fee equal to 5 percent of gross revenues for the first 10 years, and then 10 percent thereafter, with a minimum of $ 750 per wind turbine generator per year for the first 10 years and $ 1,000 thereafter. The Windfarm *314 Easement Agreement had an initial 1-year term and was automatically extended for up to 29 additional 1-year terms unless petitioner gave notice of termination. The 1984 windfarm was placed in service and $ 766.21 of electrical power was generated and delivered to Southern California Edison in December 1984. Petitioner received monthly reports on the operation of the 1984 windfarm from FloWind. In addition, petitioner arranged with FloWind to access data with respect to the 1984 windfarm via computer and modem. This enabled petitioner to monitor the 1984 windfarm in his home, which he did on a regular basis. 1985 Windfarm
In 1985, petitioner purchased another windfarm from FloWind. Petitioner's decision to purchase this windfarm was based in part upon his experience with the 1984 windfarm. Prior to purchasing the second windfarm, petitioner reviewed the materials that he had received with respect to his purchase of the 1984 windfarm. Petitioner also reviewed the FloWind Partners IV private placement memorandum, which was a limited partnership offering for a windfarm consisting of 19-meter wind turbine generators. Petitioner observed that the wind projections and power *315 curves for both the 19-meter and 17-meter wind turbine generators had been lowered since his purchase of the 1984 windfarm. The designed projected output of the 17-meter wind turbine generator was 328,000 kilowatt hours per year, but after negotiations between FloWind and petitioner, this projection was later reduced to 262,000 kilowatt hours per year. On December 30, 1985, petitioner entered into a second Windfarm Construction Agreement (1985 agreement) with FloWind. Under the terms of the 1985 agreement, FloWind constructed and sold to petitioner a windfarm (1985 windfarm), consisting in part of three 17-meter wind turbine generators, control panels, cement pads and electrical transmission lines running from each wind turbine generator up to, but not including, the pad-mounted transformer. The windfarm was to be constructed on property leased by petitioner on Cameron Ridge. The purchase price of the 1985 windfarm was $ 546,000 or $ 182,000 per wind turbine generator. Petitioner paid $ 363,000 cash and executed a level payment nonrecourse note in the amount of $ 183,000. The note was to be repaid in 20 annual installments of $ 22,980.34, at an interest rate of 11 percent *316 per annum. Detailed specifications of the wind turbine generators were attached to the 1985 agreement. Also attached to the 1985 agreement was a separate Windfarm Warranty Agreement, dated December 30, 1985. The warranty agreement was executed between petitioner and FloWind and generally provided the same warranties that were made with respect to the 1984 windfarm, except that the 5-year output warranty was only 131,000 kilowatt hours per year per wind turbine generator. FloWind did not sell windfarms without warranties. Moreover, petitioner would not have purchased the 1985 windfarm from FloWind without the warranty agreement. Petitioner entered into various contracts in connection with his purchase of the 1985 windfarm. These contracts are: A Management Agreement; an Operation, Repair and Maintenance Agreement; a Transmission Facility Agreement and Power Purchase Agreement Assignment; a Windfarm Site Agreement; and a Subordination and Fee Payment Agreement. These contracts are summarized below. Unless otherwise indicated, all of these contracts were dated December 30, 1985. Pursuant to the Management Agreement, FloWind agreed to manage the 1985 windfarm. FloWind charged *317 a monthly fee equal to 2 percent of "gross revenues." Under this agreement, gross revenues were defined as revenue derived from the sale of electricity and all proceeds derived under performance warranties and insurance proceeds for reimbursement of lost revenue. Petitioner also agreed to reimburse FloWind for all real and personal property taxes, assessments and insurance premiums incurred. The agreement had an initial 10-year term, and was automatically renewable by petitioner for up to four additional 5-year terms. Under the Operation, Repair and Maintenance Agreement, FloWind agreed to render services for the operation, repair and maintenance of the 1985 windfarm. The fee schedule was composed of two parts. For the first 10 years the fee was equal to 8 percent of monthly gross revenues. Commencing with the 11th year, the fee was equal to the greater of 12-1/2 percent of the monthly gross revenues of the 1985 windfarm or FloWind's actual operating costs and expenses. However, this fee after the 11th year was limited to no more than 20 percent of the gross revenue for the prior month, with excess amounts carried forward. The second part of the operating, repair and maintenance *318 fee was an incentive fee equal in the first 10 years to 15 percent of the amount that the gross revenues exceed projections; 30 percent in subsequent years. The agreement had an initial 10-year term, and was automatically renewed for up to four additional 5-year terms by petitioner. Pursuant to the Transmission Facility Agreement and Power Purchase Agreement Assignment, FloWind granted petitioner a non-exclusive right and non-exclusive license to use FloWind's transmission facilities for the purpose of transmitting electric power between the 1985 windfarm and Southern California Edison's transmission system. FloWind also assigned its rights under the same Power Purchase Contract that FloWind assigned with respect to the 1984 windfarm. Petitioner agreed to pay an annual interconnection service fee in the amount of $ 1,000 per wind turbine generator. Beginning on January 1, 1987, the annual service charge was subject to annual increases based upon the consumer price index. FloWind's subsidiary, Wind Energy Company, had entered into a Lease for Meteorological Research Sites and Construction of Wind Turbine Machines, dated October 10, 1981. Under the Windfarm Site Agreement, Wind *319 Energy Company assigned its rights under the meteorological research sites lease to petitioner. Petitioner agreed to pay to Wind Energy Company an annual fee equal to 6 percent of the gross revenues from the sale of electricity. On January 1, 1995, the fee was increased to 7 percent of gross revenues. The term of the lease and the Windfarm Site Agreement continued until October 10, 2014. Under the Subordination and Fee Payment Agreement, the fees that petitioner was required to pay to FloWind with respect to the 1985 windfarm were subordinated to the payments on the construction note that petitioner executed in connection with his purchase of the 1985 windfarm. The fee payments that were specifically subordinated were those payments required under the Windfarm Construction Agreement; the Operation, Repair and Maintenance Agreement; the Transmission Facility Agreement and Power Purchase Agreement Assignment; and the Management Agreement. The 1985 windfarm was placed in service and electrical power was generated and delivered to Southern California Edison Company in 1985. On Schedule C of their 1984 Federal income tax return, petitioners reported a loss in the amount of $ 144,133 *320 from their windfarm activity. This loss consisted entirely of a depreciation deduction claimed for the 1984 windfarm. On Form 3468 (Computation of Investment Credit), petitioners reported a total allowed general business credit in the amount of $ 265,076. The portion of the general business credit claimed with respect to petitioner's 1984 windfarm consisted of a regular investment credit in the amount of $ 106,003, and a business energy investment credit in the amount of $ 159,004. Petitioners claimed on Form 1040 a general business credit in the amount of $ 158,330, and designated the excess ($ 106,746) as a "carry" on Form 3468. In the notice of deficiency, respondent disallowed petitioners' windfarm activity loss and petitioners' general business credit. On Schedule C of their 1985 Federal income tax return, petitioners reported a loss in the amount of $ 278,727 from their windfarm activity. On Form 3468 (Computation of Investment Credit), petitioners reported a total allowed general business credit in the amount of $ 135,553. The portion of the general business credit claimed with respect to petitioner's 1985 windfarm, consisted of a regular investment credit in the amount *321 of $ 54,100, and a business energy investment credit in the amount $ 81,150. Petitioners claimed on Form 1040 a general business credit in the amount of $ 97,078, and designated the excess ($ 38,475) as "carried" on Form 3468. In the notice of deficiency, respondent disallowed $ 275,727 of petitioners' reported windfarm activity loss. [9] Respondent also disallowed petitioners' general business credit. OPINION In the notice of deficiency, respondent stated several *322 alternative reasons for disallowing petitioners' general business credits and losses claimed with respect to the 1984 and 1985 windfarms. After trial, however, respondent conceded most of the reasons raised in his notice of deficiency. The remaining issues as briefed by the parties are whether the purchase prices of the windfarms were in excess of their respective fair market values, whether a portion of the purchase prices should be allocated to warranties made by FloWind, whether petitioners are liable for the additions tax pursuant to section 6661, and whether petitioners are liable for the increased rate of interest pursuant to section 6621(c). [10]
*323 As a preliminary matter, petitioners argue that respondent's method of valuing the 1984 and 1985 windfarms by allocating a portion of the purchase price to warranties constitutes a new matter. Thus, petitioners argue that respondent bears the burden of proof on this issue. Generally, respondent's determination is presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a). However, respondent bears the burden of proof with "respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer," and with respect to a new position taken at trial. Rule 142(a); Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972). A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989); Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988); Achiro v. Commissioner, 77 T.C. 881, 890-891 (1981). A new theory which merely clarifies or develops the original *324 determination is not a new matter in respect of which respondent bears the burden of proof. Wayne Bolt & Nut Co. v. Commissioner, supra; Achiro v. Commissioner, supra at 890; Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968). In the notice of deficiency, respondent placed the depreciable cost basis of the 1984 and 1985 windfarms in issue. Moreover, petitioners allege in their petition that the price petitioners paid for the tangible equipment was not in excess of their fair market value. Respondent's method of valuing the windfarms by allocating a portion of the purchase prices to warranties does not constitute a new matter, but rather clarifies his original determination. Accordingly, the burden of proof remains with petitioners. Rule 142(a). The first issue for decision is whether the purchase prices of the 1984 and 1985 windfarms were in excess of their respective fair market values. As a general rule, the basis of property for tax purposes will be the cost of such property. Sec. 1012. In a money-for-property transaction, *325 cost is equal to the price paid for the property. Lemmen v. Commissioner, 77 T.C. 1326, 1347-1348 (1981). This general rule that basis is equal to cost, however, does not apply where "peculiar circumstances" surround the transaction which influence the purchaser to agree to a price in excess of the property's fair market value. Bryant v. Commissioner, 790 F.2d 1463, 1466-1467 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Lemmen v. Commissioner, supra; Bixby v. Commissioner, 58 T.C. 757, 776 (1972). In such cases, the basis of property for tax purposes may be limited to its fair market value at the time of purchase. Lemmen v. Commissioner, supra.
In the instant case, respondent argues that the tax benefits petitioner expected to receive from the purchases of the 1984 and 1985 windfarms constitute peculiar circumstances which influenced petitioner to pay more than the fair market value for the windfarms. On brief, respondent argues that petitioner relied solely upon FloWind's projections for the 1984 and 1985 windfarms and failed to make an independent inquiry *326 to verify FloWind's production estimates, or determine whether FloWind's projection estimates were based upon any type of industry standards. Respondent alleges that, at the time of purchase, petitioners realized that there was a "substantial probability their windfarms would not meet projections" and that the acceptance of FloWind's projections was caused by "the lure of tax benefits." Respondent also argues that favorable financing constitutes a peculiar circumstance, and that the purported State and Federal tax benefits petitioner expected to receive from the purchases of the 1984 and 1985 windfarms allowed petitioner to recover his "cash investment" after 3 years of operation. There are several flaws in respondent's argument. First, respondent has conceded his initial position that petitioner lacked a bona fide profit objective. The evidence presented at trial fully warranted this concession. The existence of a bona fide profit objective for petitioner's purchase of the windfarms is inconsistent with respondent's argument that petitioner was willing to pay an excessive purchase price for tax shelter purposes. Secondly, respondent's own requested findings of fact, predicated *327 on respondent's expert's report, shows that the fair market value of the windfarm which petitioner purchased in 1985 was more than his purchase price. On brief, respondent asserts that the fair market value of each 17-meter wind turbine generator was at least $ 86,237 and that the intangible value attributable to the warranties on each wind turbine generator was $ 96,733. The windfarm purchased in 1985 had three wind turbine generators, thus respondent's valuation of the 1985 windfarm was $ 548,910. Petitioner purchased the 1985 windfarm for $ 546,000. [11]
With respect to the 1984 windfarm, respondent argues, based on the same expert's report, that the fair market value of the windfarm was $ 717,081 as opposed to the contract price of $ 1,065,000. Respondent arrives at this figure by valuing each of the three 19-meter wind turbine generators at $ 115,264 and the warranties attached to *328 each wind turbine generator at $ 123,763 per turbine. Respondent does not attempt to place a specific value on tax benefits or favorable financing nor did respondent offer any evidence that either of these alleged components had separate specific values. The fact that respondent and his expert place a value on the 1985 windfarm wind turbine generators and warranties that is greater than petitioner's purchase price, without assigning any value to identical tax benefits and financing arrangements, is inconsistent with his argument that these components had substantial value in 1984. Through the course of the trial and on brief, petitioners have maintained that the amounts petitioner paid for the 1984 and 1985 windfarms were the result of arm's-length transactions, and that the purchase prices of the two windfarms were not in excess of their respective fair market values. Petitioners point out that windfarms are "congressionally-blessed investments," and thus, the existence of tax benefits should not be considered as a peculiar circumstance so as to decrease their bases in the windfarms. Taxpayers have the legal right to decrease taxes, or avoid them altogether, by means which the *329 law permits. Maxwell v. Commissioner, 95 T.C. 107, 123 (1990). Federal income tax laws affect and shape every business transaction, and parties to such transactions are entitled to take into account and to maximize favorable tax results so long as the transaction has economic substance and a business purpose. See Frank Lyon Co. v. Commissioner, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). In previous cases, we have recognized transactions which are likely to be motivated by tax reasons, but are nevertheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; purchases of property motivated by the availability of accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low-income housing partnerships; and many others. Some of these transactions are significantly tax motivated. Levy v. Commissioner, 91 T.C. 838, 871-872 (1988); Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1064 (1988); *330 Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). On their 1984 and 1985 Federal income tax returns, petitioners claimed general business credits with respect to their windfarms. See sec. 38(a). During the years in issue, these general business credits consisted of a 10-percent regular investment credit and a 15-percent energy investment credit. Sec. 46(b). The business energy investment credit was enacted as part of the Energy Tax Act of 1978, and was originally equal to 10 percent of the qualified investment. Sec. 301(a)(1), Pub. L. 95-618, 92 Stat. 3174, 3194-3195. At the time of the enactment of the Energy Tax Act of 1978, Congress was concerned about the United States' dependence upon imported oil. The business energy investment credit was enacted in order to stimulate investment into alternative energy resources, which included solar and wind energy. See H. Rept. 95-496 (Part III), 1978-3 C.B. (Vol. 2) 71, 81-85, 94; S. Rept. 95-529, 1978-3 C.B. (Vol. 2) 199, 205-211, 262-264. In 1980, Congress recognized that the then current tax law incentives were not broad enough to carry out the objectives of the Energy Tax Act *331 of 1978. As a result, and in an effort to promote increased use of alternative energy resources, Congress increased the business energy investment credit from 10 percent to 15 percent of the amount of the qualified investment, and extended the period for the availability of the credit through December 31, 1985. Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, Sec. 221(a), 94 Stat. 229, 260. See S. Rept. 96-394, 1980-3 C.B. 131, 198-199. By enacting the business energy investment credit, it is clear that Congress was encouraging investment into alternative energy resources in order to curtail the United States' dependence upon imported oil. Thus, the favorable tax incentives petitioner expected to receive from his purchases of the 1984 and 1985 windfarms should not be considered as a "peculiar circumstance" so as to reduce petitioners' bases in the windfarms, provided that these tax incentives did not cause petitioner to pay more for the windfarms than their respective fair market values. See Bryant v. Commissioner, 790 F.2d at 1466; Lemmen v. Commissioner, 77 T.C. at 1349. As a general rule the price at which *332 a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. United States v. Cartwright, 411 U.S. 546, 551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973); Marine v. Commissioner, 92 T.C. 958, 982 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McShain v. Commissioner, 71 T.C. 998, 1004 (1979). This definition assumes that the buyer and seller will have adverse economic interests. Brannen v. Commissioner, 722 F.2d 695, 701 (11th Cir. 1984), affg. 78 T.C. 471, 493 (1982); Marine v. Commissioner, supra; Narver v. Commissioner, 75 T.C. 53, 96 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Thus, regardless of how FloWind and petitioner determined the purchase prices of the windfarms, the relevant inquiry is, given the facts and circumstances as they existed on the dates petitioner purchased his windfarms, what would a willing buyer have paid FloWind for the 1984 and 1985 windfarms. *333 See Taube v. Commissioner, 88 T.C. 464, 488 (1987). In the instant case, respondent concedes that petitioner's purchases of the 1984 and 1985 windfarms had economic substance, and that petitioner purchased the windfarms with the objective of making a profit. Thus, petitioner's purchases of the windfarms were motivated by nontax business reasons. It is clear that petitioner was bargaining at arm's length with FloWind at the time he purchased his windfarms. Petitioner is experienced in business matters and in evaluating investments. He was under no "pressure" to purchase a windfarm from FloWind. Petitioner reviewed the contracts that he executed in connection with his purchases of the windfarms, and proposed changes in these contracts, some of which were incorporated into the final drafts. He also hired an attorney who reviewed the contracts. He negotiated a lower purchase price for the 1985 windfarm. We found petitioner to be knowledgeable and forthright as to his transactions with FloWind and believe him to be a credible witness. In deciding whether the purchase prices of petitioner's windfarms were in excess of their respective fair market values, we *334 find significant the fact that petitioner bargained at arm's length with FloWind. To establish the fair market value of the 1984 and 1985 windfarms, both parties presented the testimony of expert witnesses. We are not bound by the opinions of expert witnesses when those opinions are contrary to our own judgment. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295, 82 L. Ed. 1346, 58 S. Ct. 932 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. After reviewing the expert reports of both parties, we find that the purchase prices of the 1984 and 1985 windfarms were not in excess of their respective fair market values. Petitioners' principal expert witness is employed by Marshall and Stevens Incorporated as a Financial Appraiser. His appraisal experience began in 1975 and he has prepared financial appraisals for a wide variety of business entities. He has been extensively involved *335 in the appraisal of alternate energy systems. He is a member of the Institute of Business Appraisers, and is also designated as a Certified Business Appraiser. Before valuing the 1984 and 1985 windfarms, petitioners' expert personally inspected both windfarms located on Cameron Ridge and also interviewed personnel involved in the management and operation of petitioner's windfarms. He also reviewed studies performed on the wind resource at Cameron Ridge. These studies included, a California Energy Commission (CEC) staff report "Wind Energy Assessment of California," dated March 31, 1981; CEC staff report, "Relative Cost of Electricity Production," dated December 1983; and several reports, prepared by Stone & Webster, on the engineering evaluation of FloWind wind turbines. Petitioners' expert determined the fair market value of petitioner's windfarms under three different valuation methods. These three valuation methods were the cost approach, the market approach, and the income approach. Under the cost approach, petitioners' expert valued the windfarms based upon the direct and indirect costs associated with the construction of the windfarms. In determining the cost of constructing *336 the windfarms, petitioners' expert relied upon the cost information that was supplied by FloWind. Petitioners' expert witness estimated "book expenses" which included research and engineering, general and administrative, and sales costs. Petitioners' expert concluded that FloWind's costs of constructing the 1984 and 1985 windfarms were $ 832,514 and $ 500,736, respectively. The difference between FloWind's costs and amounts that petitioner paid for the windfarms represented FloWind's gross profit. Petitioners' expert compared FloWind's gross profit margins with General Electric's and Westinghouse's power systems divisions, as reported by Moody's Industrial Manual 1982 and found FloWind's gross profit margins to be substantially lower. Petitioners' expert concluded that the construction costs of the two windfarms to petitioner under the cost approach were not in excess of the fair market values of the two windfarms. Under the market approach, petitioners' expert used "comparative market data," based upon other windfarm programs, in order to arrive at a fair market value. The cost of the comparable windfarm was divided by its projected annual output which yielded a cost per projected *337 kilowatt hour. Petitioners' expert used 30 market comparables for valuing the 1984 windfarm, and 43 market comparables for valuing the 1985 windfarm. Petitioners' expert calculated the median cost per projected kilowatt hour for the 1984 windfarm market comparables to be $ 0.74, and the 1985 windfarm market comparables to be $ 0.70. These respective median figures were then multiplied by the projected output of petitioner's windfarms. Petitioners' expert concluded, under the market approach, that petitioner's 1984 and 1985 windfarms had a market value of $ 1,221,000 and $ 550,200, respectively, at the time of purchase. Under the income approach, petitioners' expert explained the methodology for valuing petitioner's windfarms as follows: The valuation methodology used in this appraisal is an income approach analysis known as a "discounted, debt-free, net cash flow." In this discounted cash flow analysis, a projection is made of the revenues, expenses before interest charges, and the impact of income taxes to arrive at the "debt-free net income" from the investment. To this, is added all noncash expenses and other elements of cash flow accruing to the investor below the net *338 income level. The resulting amount is the "debt-free net cash flow" (DFNCF) from the investment, and it is equal to the total cash return available to be paid to both equity and potential debt investors. Thus, the DFNCF represents the cash return on the total capital structure of the investment. In determining the debt-free net cash flow (cash flow) from petitioner's windfarms, petitioners' expert used a useful life for the 1984 and 1985 windfarms of not less than 20 years. Petitioners' expert also considered the Federal and State tax benefits petitioners expected to receive from the windfarms as a cash inflow. Petitioners' expert discounted the cash flow to present value. He used an initial discount rate of 14 percent, not including the years that the windfarms were purchased, and subsequently increased the discount rate 2 percent every 5 years. Petitioners' expert concluded that the fair market values of the 1984 and 1985 windfarms were $ 1,318,000 and $ 610,000, respectively. Respondent's expert is employed by the Internal Revenue Service. He has worked on a broad number of issues while employed by the Service, including valuation of wind turbine generators. Respondent's *339 expert also used the same three approaches to valuation (cost, market, income) that petitioners' expert used in valuing the 1984 and 1985 windfarms. However, for reasons discussed below, we place little weight on respondent's expert in deciding whether petitioner paid more than fair market value for the 1984 and 1985 windfarms. Under the cost approach, respondent's expert added up the "component values" of petitioner's 19-meter and 17-meter wind turbine generators. One of these component values was the manufacturing cost of the wind turbine generator. On cross-examination, respondent's expert testified that the manufacturing cost figure in his expert report represented the manufacturer's cost to construct the individual components of the wind turbine generators. Respondent's expert estimated the manufacturing cost of the 17-meter wind turbine to be $ 70,000, and the 19-meter to be $ 87,900. Additional component values that respondent's expert used to value the wind turbines were freight expenses, taxes, and construction costs. With respect to the 1984 windfarm, respondent's expert concluded, under the cost approach to valuation, that the three 19-meter wind turbine generators *340 had a fair market value of $ 349,200, or $ 116,400 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators had a fair market value of $ 285,900, or $ 95,300 per wind turbine generator. These figures do not include any value attributable to the warranties that FloWind made with respect to the 17-meter and 19-meter wind turbine generators. Respondent's expert placed a separate value on the warranties. Respondent's expert concluded that the availability and power curve warranties had a combined fair market value of $ 202,800 per windfarm, or $ 67,600 per wind turbine generator, and that the output warranties had a fair market value of $ 174,900 per windfarm, or $ 58,300 per wind turbine generator. Respondent's method of valuing these warranties is fully discussed below. After adding the fair market values of the warranties and the fair market value of the wind turbine generators, respondent's expert determined that petitioner's 1984 windfarm had a fair market value of $ 726,900, and that the 1985 windfarm had a fair market value of $ 663,600. We note that the fair market value of the 1985 windfarm, *341 as determined by respondent's expert, is substantially greater than the purchase price of the 1985 windfarm. The cost approach to valuing the wind turbine generators represented only the manufacturer's cost of producing the tangible assets. In determining the cost of replacing the component parts of the wind turbine generators, respondent's expert examined FloWind's production line manufacturing costs, and cost data obtained through other windfarm investigations. Respondent's expert did not include any costs attributable to the research, design, and development of the FloWind wind turbine generators. During cross-examination, respondent's expert was unable to identify any manufacturers of wind turbines that sold wind turbine generators to third parties at the manufacturer's cost. Under the market approach, respondent's expert used the same methodology as did petitioners' expert, by computing the average per projected kilowatt hour cost of selected market comparables. However, respondent's expert used only two market comparables to value both of petitioner's windfarms. The market comparables were taken from a Suffolk County Solar Energy Commission newsletter (dated August 1986) *342 which listed the purchase prices of selected wind turbine generators. [12] Respondent's expert calculated the average cost of the two market comparables to be $ 0.41 per projected kilowatt hour. This figure was multiplied by the projected output of petitioner's windfarms as estimated by Dr. Wilson. Dr. Wilson was respondent's expert who performed an evaluation of the wind resource at Cameron Ridge. Dr. Wilson had prepared eight reports in connection with audits of several FloWind limited partnerships. Two of these reports were used by respondent in the instant case. These two reports were prepared in 1987 in connection with respondent's audit of FloWind Managers and FloWind Partners IV. With respect to the 1984 windfarm, Dr. Wilson's output projections that respondent's valuation expert used, were not based upon any of Dr. Wilson's *343 reports that were in evidence. Respondent's expert obtained the output projection from a report that was prepared by Dr. Wilson in connection with another windfarm which was located in Altamont Pass, Alameda County, California. With respect to the 1985 windfarm, respondent's expert was unable to recall where he obtained the output projections for the 17-meter wind turbine generators. With respect to the 1984 windfarm, respondent's expert concluded, under the market approach to valuation, that the three 19-meter wind turbine generators and their respective warranties, had a fair market value of $ 451,200, or $ 150,400 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators and their respective warranties, had a fair market value of $ 389,400, or $ 129,800 per wind turbine generator. Under the market approach, respondent's expert did not allocate any independent value to the wind turbine generator warranties. Respondent's expert did not consider the market approach to be a reliable method of determining the fair market value of petitioner's windfarms. On brief, respondent argues that the market *344 approach to valuation is unreliable. Under the income approach, respondent's expert determined the gross operating revenues of petitioner's windfarms over a period of 20 years. The operating expenses were deducted from gross operating revenues in order to determine net revenue. Respondent's expert discounted the net revenues to present value in order to determine the fair market values of petitioner's windfarms. He used a discount rate of 20 percent. Respondent's expert relied upon inappropriate information in determining the gross operating revenues of petitioner's windfarms. Gross operating revenues were estimated by multiplying the projected energy production of petitioner's wind turbine generators by the "avoided cost" of electricity. Respondent's expert did not use the projected output of petitioner's wind turbine generators as estimated by FloWind. Instead, he used the projected output of petitioner's wind turbine generators as estimated by Dr. Wilson. These estimates prepared by Dr. Wilson do not purport to evaluate petitioner's windfarms. The price per kilowatt hour that respondent's expert used in determining gross operating revenue of the 1984 windfarm was not *345 based upon the power purchase contracts between petitioner and Southern California Edison. Instead, the price per kilowatt hour that respondent's expert used was obtained from the FloWind Partners II private placement memorandum. FloWind Partners II was a 17-meter windfarm located in Altamont Pass. On cross-examination, respondent's expert was unable to recall whether the cost per kilowatt hour as stated in the FloWind Partners II private placement memorandum was the same as the price per kilowatt hour that Southern California Edison was required to pay petitioner under the power purchase contract. The net cash flow of the 1984 windfarm was determined by subtracting expenses from the estimated gross operating revenue. One of the expenses that respondent's expert subtracted from gross operating revenue was an "initial management fee" in the amount of $ 10,000, which was taken from the FloWind Partners II private placement memorandum. However, petitioner was never required to pay an initial management fee. Moreover, respondent's expert testified that he did not base any of the expenses that he subtracted from gross operating revenues on the contracts that petitioner executed *346 in connection with his purchase of the 1984 windfarm. The operating and maintenance expense figure was obtained from Dr. Wilson's report. The other expenses, which included property taxes, a transmission facility fee, insurance, and land rental, were obtained from the FloWind Partners II private placement memorandum. With respect to the 1985 windfarm, all of the expenses that respondent's expert subtracted from gross operating revenues were obtained from the FloWind Partners IV private placement memorandum. FloWind Partners IV was a 19-meter windfarm; petitioner's 1985 windfarm was a 17-meter windfarm. With respect to the 1984 windfarm, respondent's expert concluded, under the income approach to valuation, that the three 19-meter wind turbine generators had a fair market value of $ 495,000, or $ 165,000 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators had a fair market value of $ 240,900, or $ 80,300 per wind turbine generator. Respondent's expert concludes, after adding the values of the warranties, that petitioner's 1984 windfarm had a fair market value of $ 872,700, and the 1985 windfarm *347 had a fair market value of $ 618,600. We note that the fair market value of the 1985 windfarm, as determined by respondent's expert using the income approach, is substantially greater than the purchase price of the 1985 windfarm. We find that petitioners have met their burden of proving that petitioner did not pay in excess of fair market value for the 1984 and 1985 windfarms. Accordingly, petitioner's bases in his 1984 and 1985 windfarms are equal to their respective purchase prices. The second issue for decision is whether a portion of the purchase prices of petitioner's 1984 and 1985 windfarms should be allocated to warranties made by FloWind. On brief, respondent argues that petitioner purchased a "bundle of assets" and, as a result, argues that the purchase prices of the windfarms should be allocated to these assets. These assets, according to respondent, are the wind turbine generators and their respective availability and output warranties. Section 38(b)(1) provides for a credit for qualified investments in section 38 property in the first year the property is placed in service. Section 38 property is defined as "tangible personal property" or "other tangible property." *348 Sec. 48(a)(1); Sec. 1.48-1(a), Income Tax Regs. See Texas Instruments, Inc. v. United States, 551 F.2d 599 (5th Cir. 1977); Ronnen v. Commissioner, 90 T.C. 74 (1988). Section 38 property also includes "energy property" which is defined with reference to recovery property under section 48(1). Generally, recovery property means "tangible property of a character subject to the allowance for depreciation." Sec. 168(c)(1). Both parties agree that, if viewed separately from the wind turbine generators, the availability and output warranties would be considered intangible property. With respect to the 1984 and 1985 windfarms, FloWind made a 5-year availability warranty, under which FloWind warranted that each wind turbine generator would be available for operation for 90 percent of each year for 5 years. Generally, the availability warranty provided that if a wind turbine generator was unavailable for more than an aggregate of 877 hours per year, then FloWind would reimburse petitioner for each hour of unavailability after 877 hours. The amount that FloWind was required to pay petitioner was determined by multiplying the contracted price of *349 electricity by the number of kilowatt hours that would have been produced during the period of unavailability after the initial 877 hours. Coverage under this warranty was limited to $ 25,000 per wind turbine generator per year. FloWind also made a 5-year output warranty, under which FloWind warranted that petitioner's 1984 and 1985 windfarms would produce no less than 50 percent of their respective designed projected output per year for each of the first 5 years of operation. The projected output of petitioner's 1984 windfarm was 1,650,000 kilowatt hours per year, and the projected output of petitioner's 1985 windfarm was 262,000 kilowatt hours per year. Thus, FloWind would become liable under the output warranties if petitioner's 1984 windfarm produced less than 825,000 kilowatt hours per year, and if petitioner's 1985 windfarm produced less than 131,000 kilowatt hours per year. Any amounts that FloWind was required to pay under the output warranties were offset by any payments that FloWind made under the other warranties. [13]
*350 Respondent argues that the availability and output warranties are intangible property, and that the amounts allocable to these warranties must be excluded for purposes of computing the available credits under section 38 and available deductions under section 168. [14] On brief, respondent has requested an ultimate finding of fact that the availability and output warranties should be valued, per wind turbine generator, as follows: 19-Meter Wind
17-Meter Wind Turbine Generator
Turbine Generator [15]
Availability warranty
$  67,500
$ 67,590
Output warranty
56,263
[16] 29,143  Total
$ 123,763
$ 96,733
*351 When warranties are offered as the standard practice of an industry, such warranties generally add little or nothing to the value of the warranted asset. See Houchins v. Commissioner, 79 T.C. 570, 593-594 (1982); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1239 (1981). See also Autrey v. United States, 889 F.2d 973, 983-984 (11th Cir. 1989). The evidence shows that FloWind's competitors made warranties in connection with the sale of windfarms. During 1984, one of FloWind's competitors sold windfarms with a 70-percent output warranty. The warranties that FloWind made during 1984 were in response to this competition. We note that FloWind apparently made similar availability and output warranties in connection with the sale of windfarms to FloWind Partners 1984, and FloWind Partners IV. FloWind made an availability warranty to FloWind Partners II, but did not make any type of output warranty to FloWind Partners II. We were not persuaded by respondent's expert's income approach to valuing the availability and output warranties of the windfarms. Respondent's expert determined that the availability warranties *352 would yield a gross income stream in the amount of $ 25,000 per wind turbine generator per year for 5 years. In order for petitioner to receive the maximum amount payable under the availability warranties, the windfarms would have to be inoperable for the entire warranty period of 5 years. Respondent argues that there was a "substantial probability" that the availability warranties would be called upon, and thus, it is reasonable to assume that petitioner would receive the maximum amount payable under the availability warranties. We disagree. Petitioner reviewed wind studies on the Cameron Ridge area and reviewed the projected output of his windfarms. He purchased his windfarms with the objective of making a profit, as conceded by respondent. Petitioner made significant cash down payments toward the purchases of his windfarms. Based upon the information available to petitioner at the time he purchased his windfarms, we do not believe that it is reasonable to assume that petitioner's windfarms would be inoperable for 5 years, as respondent's expert has assumed for purposes of valuing the availability warranties. Respondent's expert also used the income stream approach to valuing *353 the output warranties. On cross-examination, however, it became clear that respondent's expert misunderstood the conditions under which FloWind became liable to petitioner under the output warranties. The gross revenues payable under the output warranties were determined by multiplying a projected output figure for both windfarms by a cost per kilowatt hour. [17]FloWind became liable under the output warranties only if the windfarms failed to produce 50 percent of their projected output. The projected kilowatt hour figures that respondent's expert used in determining the gross revenues payable under the output warranties were not reduced by 50 percent, as would be required. On cross-examination, respondent's expert agreed that, under his method of valuing the output warranties, he overstated the value of these warranties. *354 The amount that respondent's expert determined would be payable under the output warranties was based upon the assumption that petitioner would receive the maximum amount payable under the output warranties. On brief, respondent argues that it is reasonable to allocate the full value of the output warranties, as determined by respondent's expert, to the purchase prices of the windfarms. We note that respondent's own witness, who was employed as comptroller of FloWind during 1984 and 1985, testified that FloWind did not anticipate any material exposure under its output warranties. We believe that it is unreasonable to assume that petitioner would receive the maximum amount payable under the output warranties. Based upon the evidence in the record, we believe that the availability and output warranties did not have a separate identifiable value. Accordingly, we find that petitioners have met their burden of proving that no portion of the purchase prices of petitioner's windfarms should be allocated to their respective availability and output warranties. Respondent also determined that petitioners are liable for additions to tax under section 6661. Section 6661 imposes an addition *355 to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988). Respondent's deficiency determination for petitioners' taxable year 1984 was based entirely upon petitioner's windfarm activity. Our finding that petitioner did not pay in excess of fair market value for his windfarms is thus dispositive of this issue. Accordingly, petitioners are not liable for the addition to tax under section 6661 for taxable year 1984. With respect to taxable year 1985, respondent also increased petitioners' income to include additional interest income and a "capital gain and loss." Petitioners have conceded these adjustments. In the notice of deficiency, *356 respondent determined the section 6661 addition to tax based upon petitioners' underpayment attributable to petitioner's windfarm activity and the capital gain and loss adjustment. Respondent did not determine the addition to tax, under section 6661, with respect to the portion of petitioners' underpayment attributable to interest income. Since we have found that the amount petitioner paid for his windfarms was not in excess of their respective fair market value, no underpayment exists with respect to petitioner's windfarm activity in 1985. Thus, the only item of adjustment for taxable year 1985 that is subject to the addition to tax under section 6661 is petitioners' capital gain and loss adjustment. However, the amount of tax attributable to petitioners' capital gain and loss adjustment is less than $ 5,000. Accordingly, petitioners are not liable for the addition to tax under section 6661 for taxable year 1985. The final issue for decision is whether petitioners are liable for the increased rate of interest under section 6621(c). Section 6621(c) provides that with respect to interest payable under section 6601, an increased rate of interest is imposed when there is a "substantial *357 underpayment" (exceeds $ 1,000) "attributable to one or more tax motivated transactions." A "tax motivated transaction" includes "any valuation overstatement" as defined in section 6659(c). Sec. 6621(c)(3). Under section 6659(c), a valuation overstatement is present if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct valuation of such property. According to respondent's brief, the determination that petitioners are liable for the increased rate of interest is based upon the valuation of the 1984 and 1985 windfarms. We have found that petitioners did not pay in excess of the respective fair market value of the 1984 and 1985 windfarms, and that no portion of the purchase prices of the windfarms should be allocated to warranties made by FloWind. Accordingly, we hold for petitioners on this issue. Due to concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Based upon respondent's computation of the addition to tax under section 6661 for taxable year 1985, respondent did not determine the addition to tax under section 6661 with respect to the portion of petitioners' underpayment attributable to $ 161,869 of interest income.↩
3. Petitioners concede that they owe tax on an additional $ 161,869 of interest income for taxable year 1985. Petitioners also concede a $ 556 adjustment for taxable year 1985, which was labeled "capital gain and loss" in the notice of deficiency. Respondent concedes that petitioners are not liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2).↩
4. Petitioners have requested, on brief, that we specify the amount of the 1984 business credit that petitioners may be entitled to carryback, under section 39, to taxable year 1983. Our responsibility is limited to redetermining the deficiencies determined for the years before us. See LTV Corp. v. Commissioner, 64 T.C. 589, 593↩ (1975). The notice of deficiency and petition relate only to taxable years 1984 and 1985. We have no jurisdiction over taxable year 1983. Sec. 6214(b).
5. The Flowind Partners 1984 private placement memorandum also contained information relevant to the 19-meter wind turbine generator.↩
6. Dr. Berry was an officer and shareholder of Wind Energy Company. At the time Dr. Berry performed his wind study, Wind Energy Corporation had leased or purchased private land and applied for the use of Bureau of Land Management land on Cameron Ridge for the purpose of installing a large wind-electric power plant. In May of 1984, Wind Energy Company became a subsidiary of FloWind. Dr. Berry exchanged his shares of stock in Wind Energy Company for preferred shares of FloWind which, at the time of trial, were still held by Dr. Berry.↩
7. CAM1 had originally been established by Atmospheric Research & Technology, Inc., in November 1979 and operated through January 1981. As part of his wind study for FloWind Partners III, Dr. Berry used the wind measurement data that was recorded from CAM1 during this time period.↩
8. The Long Term Power Purchase Contract between FloWind and Southern California Edison Company was entered into on August 6, 1984, and was amended and restated on April 16, 1985. FloWind entered into the contract "acting in its own behalf and in behalf of other owners, if any, as Project Manager." The contract had a 30-year term, beginning on or about September 1, 1984, and was thereafter terminable on 90 days' notice by either party. The contract had a fixed payment schedule for 10 years. Thereafter, the price was based on the utility's avoided cost with a minimum. The Power Purchase Agreement was a standard offer #4 contract which at that time was generally available to any small power producer.↩
9. With respect to 1985, the total of the expenses listed on petitioners' Schedule C was $ 333,092, whereas the indicated total was $ 330,092. The IRS Service Center subtracted the $ 330,092 on line 32 from the $ 54,365 on line 5 and came up with ($ 275,727) on line 33, instead of the ($ 278,727) petitioners had indicated. The Service Center reduced petitioners' refund with respect to the interest income by the tax attributable to the $ 3,000. Thus, the notice of deficiency added back only $ 275,727 with respect to the $ 278,727 "wind energy loss." ↩
10. In the notice of deficiency, respondent also disallowed petitioners' windfarm losses and general business credits because petitioners were not at risk within the meaning of section 465, and because the windfarms did not qualify for the investment and business energy credits. Respondent has failed, however, to address these issues on brief. Respondent has apparently abandoned these arguments, and we will not consider them further. Sundstrand Corporation and Subsidiaries v. Commissioner, 96 T.C. 226 (Slip Op. at 174-175) (1991). See Ideal Basic Industries, Inc. v. Commissioner, 82 T.C. 352, 366↩ n.4 (1984).
11. As explained hereafter, the report of respondent's principal expert placed an even greater value on the 1985 windfarm.↩
12. Respondent's expert could not recall when the wind turbine generators that he used as market comparables were installed, but testified that they were installed between 1982 and 1985.↩
13. FloWind also made a power performance warranty in connection with petitioner's purchases of the 1984 and 1985 windfarms. Under this warranty, FloWind warranted that each wind turbine generator would be capable of operating at 90 percent of its projected power performance, in accordance with a power production curve for a period of one year. The remedy for breach was either the modification of the wind turbine generator or installation of additional wind turbine generators. Respondent's expert appears to have valued the power performance warranties and the availability warranties together. Respondent has not argued that any portion of the purchase prices of the 1984 and 1985 windfarms should be separately allocated to the power performance warranties.↩
14. On brief petitioners point out that if we find that a portion of the purchase prices of the windfarms should be allocated to warranties, then such warranties would be amortizable over the warranty period.↩
15. As we have previously noted, respondent's valuation of the 1985 windfarm, including the value of the output and availability warranties and the wind turbine generators, is greater than the actual purchase price of the 1985 windfarm.↩
16. Respondent's expert's report valued this warranty at $ 58,286. Respondent's brief gives no explanation for this variance. However, we assume that it is in recognition of the fact that respondent's expert erroneously used an output figure that was double the amount covered by the warranty.↩
17. As between the two windfarms, respondent's expert used a different kilowatt hour multiplier for determining the gross revenues payable under the output warranties. Respondent's expert was unable to explain his reasons for using two different multipliers.↩